Vernon et al. *v.* Firemen's Pension Fund,
Appellant.

Argued November 18, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*James Francis Ryan,* for appellant.

*Philip Richman,* with him *Jacob S. Richman* and *Richman & Richman,* for appellees.

OPINION BY ROSS, J., April 16, 1947:

John Vernon, a fireman in the employ of the City of Philadelphia, and a member of the defendant corporation in good standing, suddenly collapsed while fighting a grass fire in the course of his duties and died within a very few minutes. His widow and minor son made application for pension benefits, and after the applications were denied, they instituted a single action in assumpsit. The trial judge directed verdicts for the plaintiffs for agreed amounts. Motions for new trial and judgments n. o. v. were dismissed by the court en banc, and this appeal followed.

Article II of the defendant's charter sets forth, inter alia: "The purposes for which the said Association is formed are the accumulation of a permanent fund . . . for the purpose of placing on the pension list such members as may be retired from the rolls . . . and for the widows, or dependent parents and orphans of members *who may be killed or die from injuries* received whilst in the discharge of their duty." (Italics supplied.) Article XI, section 5 of defendant's by-laws provides, inter alia: "The widow and the dependent child or children

of a member who was killed while in the discharge of his duty, or who died within sixty (60) days after being injured as a direct result of an injury or injuries received while a member and while in the actual discharge of his duties, shall be entitled to apply for a pension. . . ."

Plaintiffs' uncontradicted oral evidence tended to prove the following facts: John Vernon, plaintiffs' decedent, who had been employed as a fireman by the City of Philadelphia since 1919, left his home at about 7:30 a.m. January 3, 1942, to report at his assigned post for duty. He was then 52 years of age and his health was good. At about 10:50 a.m. an alarm was received and answered by the company, consisting of a captain and six hosemen. Vernon drove a combination pumper to the reported scene of the fire. There they found a brush and grass fire, covering a substantial portion of a 25-acre field. The grass and brush ranged as high as three and one-half feet and the fire created considerable smoke and heat. A moderately strong wind was prevailing and fanning the flame and smoke. Vernon was assigned to cover a frontage of from 50 to 60 feet along the line of fire, the other members being similarly deployed, and facing windwardly, they attacked the flames with brooms, the usual method of combatting this type of fire. After a short time, Vernon collapsed and died within a few minutes.

Dr. Daniel Gelfand, a cardiologist, who had never seen the decedent but heard the plaintiffs' evidence as adduced, testified on direct examination as follows: "In my opinion, considering the age of the man, the manner of his death, shortly after this exertion, from the experience I would say that this man died of what we commonly call a heart attack, which technically is a coronary insufficiency, which means that the blood vessels to the heart are simply not able to carry enough blood to the heart at that particular time, and added to the factor of smoke and fire and heat and the exertion he was undergoing at this time, it was simply too much

for his heart to stand and he died either as a result of a coronary occlusion—that is, the actual blocking up of the blood vessels of the heart—or that the heart simply did not get enough oxygen to carry on with its needs and stopped beating. . . ." Q. "You state there, doctor, that added to the smoke and the exertion and the heat. Will you give us so that the jury and His Honor can understand it, how the additional factors such as those would affect the heart condition?" A. "Well, all hearts, all muscles, all tissues, work only because of the fact that blood carries oxygen to these tissues and in this particular case, or in any heart case, there isn't enough blood . . . and oxygen carried to the heart under these particular conditions, because the heart is beating faster, the body is called upon to do more work, and the other factor here would be that the smoke and heat actually had taken away oxygen from the air that this man breathed, so that there were two factors working here. The heart was beating fast and calling for more blood and more oxygen and the air that he was breathing was actually diminished in the amount of oxygen that he breathed in at any one time, so that the smoke and heat definitely were a factor in this particular case. As a result of these two factors working in combination, the heart definitely had, as I say—it was either one of these arteries was blocked off, or the heart simply did not get enough oxygen as a result of these two factors, and naturally the heart died, the heart stopped beating." On cross-examination the witness testified, "This man died of a heart attack. Now that heart attack could have come about in one of two ways. One was by the formation of a coronary thrombosis and the coronary thrombosis was induced by the over-exertion. The other mode of death would have been by simple coronary insufficiency, where the heart was not getting sufficient oxygen due to several factors. One was that the over-exerted heart was beating in response to demands made upon it to fight this fire, the heart was beating fast and called for an abnormal quantity

of blood. Now, it couldn't get it because the coronary artery couldn't deliver it. It delivered as much blood as it could. However, that blood was not fully oxygenated by reason of the fact that there was smoke and there was flame, depriving the normal amount of oxygen from the atmosphere that he was breathing at the time. As a result of these factors, the heart did not get enough oxygen and it developed what we call anoxia, which is lack of oxygen, and he expired from that source, from that etiology." He concluded by expressing his unqualified opinion that the deceased's "death was precipitated . . . by fighting the fire that particular day".

At the close of the case, after considerable discussion between the trial judge and counsel relative to the questions, if any, to be submitted to the jury, the following stipulation was entered on the record by counsel for the defendant: "If Your Honor please, as a result of our discussion it may be put on the record that it is agreed that the decedent died from heart failure due to his exertions at the fire and the *conditions at the fire under which he was working."* (Italics supplied.) Consequently, there is no conflict and since the defendant has adopted the plaintiffs' evidence, our only concern is with the propriety of the direction of the verdict on that evidence, the truth of which is admitted. *Brownsville Lodge No. 357, K. P., v. Great American Indemnity Co.,* 128 Pa. Superior Ct. 553, 194 A. 529; *Say v. Prior Oil Co.,* 157 Pa. Superior Ct. 629, 43 A. 2d 417.

The appellant contends that the plaintiffs are barred from recovery in this case by Article XI, section 3 of its by-laws, which provides as follows: "Whenever in these by-laws reference is made to an *injury or injuries* which result either in rendering a member of this association incapable of performing the duties of his position or in his death, it shall be construed to mean that such *injury or injuries* shall not consist in any *abnormal condition* of the body, whether external or internal, or any *disease* brought about by any over-exertion or exposure to the elements that may be incident to the

proper discharge of the duties of the position held by the member, which duties he is expected not only to perform, but to be able to perform, and any such *bodily condition* or *disease* so brought about shall not entitle the member or his dependents to a pension." (Italics supplied.)

In our opinion, this section of the by-laws does not apply to a member of the defendant association who was *killed* while in the discharge of his duty. If he was *killed*, it would appear to be of no moment that, at the time he was killed, he had an abnormal condition of his body or was suffering from some disease. We are aided in this interpretation by the punctuation used in section 5, and although words, and not the punctuation, are the controlling guide *(Richter v. Commonwealth Casualty Co.*, 93 Pa. Superior Ct. 28), punctuation may aid in determining the meaning of the by-laws. 44 C.J.S., sec. 294. As stated by the learned court below: "In Sec. 5 of Article XI there is a comma after the word 'duty', which ends the first clause, and a comma after the word 'duties', which ends the second clause, and there is no comma in between. There is thus a complete separation of the clauses which define the two instances in which the widow and dependent children 'shall be entitled to apply for a pension'. Furthermore, the fact that there is no comma in the second clause, after the word 'injured', appearing therein, indicates that the words which follow, 'as a direct result of an injury or injuries received' were not intended to relate back to the word 'killed', as used in the first of the two clauses."

Even if we were to assume that the exceptions or limitations of section 3 apply if a member is killed, they would not help the defendant association under the evidence in this case. The record is barren of any evidence that the deceased had any pre-existing abnormal condition of his body and, on the contrary, the evidence shows that he was in sound physical condition, that his health

was "very, very good", and that he had regularly attended to his duties as a fireman. "Disease" denotes a disability or ailment of some duration. As stated in 29 Am. Jur., Insurance, section 995: "The words 'disease' and 'bodily infirmity' are frequently used in exceptions in accident insurance policies and double indemnity provisions and have a well-understood meaning. They are construed to be practically synonymous, and to refer only to some ailment or disorder of an established or settled character to which the insured is subject. As used in such policies and provisions, these words have no reference to any temporary disorder which is new and unusual, and arises from some sudden and unexpected derangement of the system. . . ." Cf. *Arnstein v. Metropolitan L. Ins. Co.*, 329 Pa. 158, 196 A. 491. It is clear from the evidence in this case that Vernon did not die from *disease* within the ordinary meaning of the word. While fighting the fire, he collapsed and died within a matter of minutes.

This appeal resolves itself into a determination of whether under the evidence Vernon was "killed" within the meaning of the word as used in the charter and by-laws of the defendant association. The charter and by-laws should be construed most strongly against the association and in favor of the plaintiffs *(Cerelli v. Order of Brotherly Love,* 158 Pa. Superior Ct. 319, 44 A. 2d 774), and there is no intention shown in either to limit "killed" to death resulting solely from the application of external violent physical force to the body. On the contrary, it appears to have been used to denote a sudden accidental death while discharging the duties of the member's employment, as distinguished from death resulting either after a substantial loss of time from injuries sustained or from disease. This is the meaning that would be ascribed to it in common parlance and no reason appears why the ordinary meaning should yield to a more technical construction.

According to the stipulation of record, Vernon's death was caused "from heart failure due to his exer-

tions at the fire and the conditions at the fire under which he was working".

The legal reasoning of our appellate courts in workmen's compensation cases is applicable to the "exertion" phase of this case. In *Barr v. Atlantic Elevator Co.,* 124 Pa. Superior Ct. 57, 187 A. 815, this court, at page 60, quoted with approval the following language which had been used by the court below : " 'Where, on the other hand, a sound heart is affected by a severe exertion, and has not before been so affected, the inference is fair that the exertion which affected the heart, while it was of the same sort, must have differed in degree from that which was usual. It must have, as a fact, been more severe than usual and should be classified with those fortuitous *physical violences of the bodily structure,* which are properly described as accidents.' " (Italics supplied.) Cf. *Foster v. State College Boro.,* 124 Pa. Superior Ct. 492, 189 A. 786.

At the time of his collapse, Vernon was attempting to beat out fire "only the length of a broom away from the actual flame", which was two and a half to "three and a half feet high" and with the wind "driving the fire towards him". The flame consumed the oxygen in the air and "as a result . . . the heart did not get enough oxygen". From this evidence relative to the "conditions at the fire under which he was working" it would appear that Vernon was killed just as surely by the fire as if it had come in direct contact with his body.

The appellant is a beneficial association, the purpose of which is "philanthropic or benevolent" [1] and its charter and by-laws should be liberally construed in order to effectuate that purpose. It is our opinion that Vernon was "killed" within the meaning of the charter and by-laws of the defendant association, and that the plaintiffs are entitled to recover.

Judgments affirmed.

---

[1] *Commonwealth v. Equitable Beneficial Assn.,* 137 Pa. 412, 18 A. 1112.