Marie L. Seybold, Petitioner *v.* Commonwealth of Pennsylvania, Department of General Services, Respondent.

Argued March 3, 1983, before President Judge CRUMLISH, JR. and Judges WILLIAMS, JR. and BARBIERI, sitting as a panel of three.

*Ronald P. Koerner, Gatz, Cohen, Segal & Koerner,* for petitioner.

*Thadeus A. Tanski,* Chief, General Litigation Unit, with him *Anthony P. Krzywicki,* Chief Counsel, for respondent.

OPINION BY JUDGE BARBIERI, June 17, 1983:

This is an appeal from an opinion and order of the Department of General Services (Department) which found that the Bureau of Risk and Insurance Management properly denied the payment of a death benefit to the petitioner, Marie L. Seybold.

Marie L. Seybold (Petitioner) is the widow of Charles H. Seybold, a former fireman for the City of Pittsburgh. Her claim is for the $25,000 death benefit provided for firefighters "killed in the performance of [their] duties" by Section 1 of Act of June 26, 1976 (Act), P.L. 424, *as amended,* 53 P.S. §891.

On February 1, 1976, Mr. Seybold was on duty when an alarm was sounded. Mr. Seybold donned boots, heavy protective clothing and a helmet and drove a pumper truck approximately one mile to the Carlton House where the alarm had been triggered. Mr. Seybold then carried about 47 pounds of equipment to an elevator, rode it to the ninth floor and proceeded at a "fast walk" up the stairs to the tenth floor with the equipment. There was then some smoke on the tenth floor, described by one witness "as cook-

ing smoke." The extent of decedent's exposure to smoke is not clear. Decedent's superior, Captain Richard G. Bilby, the only witness to be called concerning the circumstances at the scene, testified that decedent "would ... have inhaled smoke ...," during a period of approximately ten minutes. He testified that he and decedent returned to the fire station where decedent died within a half hour following the episode at the scene of the alarm. The medical witnesses, one for each litigant, were at odds. Appellee's witness, Dr. George R. Moffitt, with extensive qualifications as a cardiologist, was of the opinion that decedent's death was the result of a "slowly progressive disease process that had built up to a climax resulting in a cardiac death." He did state, however: "If there is enough smoke in a combustive atmosphere and there are large amounts of carbon monoxide, then there is no question that this could be a cause of death." The deposition of Dr. Joshua A. Perper, Chief Forensic Pathologist for the County of Allegheny, was offered by Claimant. The deposition was taken in Allegheny County because of Dr. Perper's unavailability to travel to Harrisburg where the hearing examiner sat. Petitioner offered a four page document containing the curriculum vitae of Dr. Perper, including approximately thirty-five publications which he had written, eleven of which dealt with sudden death and seven of these with heart or cardiac deaths. Dr. Perper's testimony was that decedent's activities in connection with the alarm on February 1, 1976, with the physical and mental stress involved, coupled with decedent's cardiovascular condition, triggered and caused the fatal heart attack suffered by decedent. The hearing examiner, stating that the opinion of Dr. Moffitt was "more probative on the re-

lationship that the events Mr. Seybold experienced at the Carlton House had on his death . . .," concluded:

Therefore, the Hearing Examiner finds that the decedent was not "killed" as that term is defined in 4 Pa. Code §89.1 and that the claim was properly denied by the Bureau of Risk and Insurance Management.

The word "killed" is defined in regulations of the Bureau of Risk and Insurance (4 Pa. Code §89.1) as follows:

Death as the direct and proximate result of a wound or other condition of the body caused by *external force,* including injuries by bullets; explosives; sharp instruments, blunt objects or other physical blows; chemicals; electricity; climatic conditions, including gases, heat, and lack of air; infectious diseases; radiation; and bacteria; but *excluding stress and strain and diseases which arise merely out of the general performance of duty.* (Emphasis added.)

Petitioner urges that the regulation be disregarded "as being violative of the legislative intent as expressed in Act 101 of 1976." Respondent relies heavily upon the requirement in the regulation that death must result from "external force" and upon the exclusion of death from "stress and strain and diseases which arise merely out of the general performance of duty."

While we may not question the fact-finding prerogatives of the hearing examiner, *Boughter v. Department of Public Welfare,* 55 Pa. Commonwealth Ct. 521, 423 A.2d 806 (1980), it is our duty and responsibility to examine the legal basis on which his findings were predicated. This brings us to the Bureau's Regulation 89.1 defining the word "killed."

.The Act to which we and the Department of General Services must look for guidance in determining whether or not petitioner should succeed in her request for benefits arising out of the death of her firefighter husband simply provides for the payment of $25,000 "as a benefit to the surviving spouse, or . . . to the minor children of the firefighter . . .," where the "firefighter is killed in the performance of his duties. . . ." Section 1 of the Act. In.Section 3 of the Amendatory Act of October 16, 1981, P.L. 295, however, it is provided that, "retroactive to January 1, 1976, [the original Act] . . . shall be applicable to the *deaths* of all fire-fighters . . . dying on and after said date *as the direct result of injuries sustained in the performance of their duties,* regardless of the date when *such injuries* occurred." (Emphasis added.)

Considering the meaning of the word "killed" as it must have been intended by the legislature, it must be remembered that this statute, like other social legislation, such as workmen's compensation laws, must be construed liberally in order to effectuate its beneficent purposes. *See LeGare v. Unemployment Compensation Board of Review,* 498 Pa. 72, 444 A.2d .1151 (1982); *Commonwealth v. College,* 497 Pa. 71, 439 A.2d 107 (1981); *Krawchuk v. Philadelphia Electric Co.,* 497 Pa. 115, 439 A.2d 627 (1981); *Kremer v. State Ethics Commission,* 56 Pa. Commonwealth Ct. 160, 424 A.2d 968 (1981).

Our. research has yielded but two cases in which the word "killed" has been interpreted. In one of these, the case of *Vernon v. Firemen's Pension Fund,* 160 Pa. Superior Ct. 617, 52 A.2d 199 (1947), the fireman's widow claimed pension benefits, provided under the pension fund's by-laws for a member (fireman) "who may be killed or die of injuries received whilst in the discharge of . . . duty." The Court held

that, although decedent died a heart death without external violence or injury, he was "killed" while on duty and that, therefore, it was unnecessary to decide the alternative question whether he died of "injuries" received. In so ruling, the Court stated:

> This appeal resolves itself into a determination of whether under the evidence Vernon was "killed" within the meaning of the word as used in the charter and by-laws of the defendant association. The charter and by-laws should be construed most strongly against the association and in favor of the plaintiffs (Cerelli v. Order of Brotherly Love, 158 Pa. Superior Ct. 319, 44 A.2d 774), and there is no intention shown in either to limit "killed" to death resulting solely from the application of *external violent physical force* to the body. On the contrary, it appears to have been used to denote a sudden accidental death while discharging the duties of the member's employment, as distinguished from death resulting either after a substantial loss of time from injuries sustained or from disease. This is the meaning that would be ascribed to it in common parlance and no reason appears why the ordinary meaning should yield to a more technical construction. (Emphasis added.)

*Id.* at 623, 52 A.2d at 202.

The Court also stated:

> In our opinion, this section of the by-laws does not apply to a member of the defendant association who was *killed* while in the discharge of his duty. If he was *killed,* it would appear to be of no moment that, at the time he was killed, he had an abnormal condition of his

body or was suffering from some disease. (Emphasis in original.)

*Id.* at 622, 52 A.2d at 201.

Recently, in the dissenting opinion of Mr. Justice NIX in *Appeal of Stanton,* Pa. , 452 A.2d 496 (1982),[1] interpreting the language in the pension provisions of The Third Class City Code, Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §§101-39701, it is stated that ''the word 'killed' implies a death resulting from a traumatic event. . . .'' *Id.* at , 452 A.2d at 500. A traumatic event, of course, is an injury, which in medicine may include emotional shock or psychic trauma. Dorland's Medical Dictionary (24th ed. 1965).[2] In the decisions of our courts where the term ''injury'' is defined in its common, non-technical sense, the term has been quite liberally and broadly construed. *See Creighan v. Firemen's Relief & Pension Fund Board,* 397 Pa. 419, 155 A.2d 844 (1959), adopting the definition of ''injury'' as it appears in Webster's International Dictionary (fireman's tuberculosis was ''injury'' in line of duty); *Workmen's Compensation Appeal Board v. Bernard S. Pincus Co.,* 479 Pa. 286, 388 A.2d 659 (1978) (heart death without other violence is an ''injury''); *University of Pittsburgh v. Perlman,* 49 Pa. Commonwealth Ct. 347, 405 A.2d 1048 (1979) (mental illness constitutes ''injury'').

Also, while the language of the 1981 amendment to the Act may not have been intended to supplant

---

[1] The case is not on point, since it deals with a pension claim for a fireman's death which was admittedly ''not job-related.''

[2] *See also Foster v. State College Borough,* 124 Pa. Superior Ct. 492, 189 A. 786 (1937), where the breadth of the accidental injury concept as applied to firemen is expounded at length, especially at 499-500.

the word "killed," the amendatory language certainly provides guidance in determining legislative intent. Sections 1921(c)(5) and (7) of the Statutory Construction Act of 1972, 1 Pa. C. S. §1921(c)(5) and (7). As noted above, the Legislature in 1981, retroactive to 1976, stated that the original Act "shall be applicable to the *deaths* of all fire-fighters . . . as the direct result of *injuries* sustained in the performance of their duties. . . ." (Emphasis added.) We hold that in light of the present state of Pennsylvania law, it is unreasonable to interpret the eligibility language of the Act of 1976, *as amended,* to call for the limitations imposed by the Department in its Regulation 89.1.

As Judge Craig stated, in writing for a panel of this Court, in the case of *Fields v. Department of Public Welfare,* 47 Pa. Commonwealth Ct. 172, 407 A.2d 155 (1979): "If the statute confers eligibility, a regulation with contrary effect would not be controlling." *Id.* at 174, 407 A.2d at 156. *See also Sciulli v. Pennsylvania Crime Victim's Compensation Board,* 74 Pa. Commonwealth Ct. 36,      A.2d      (1983).

We recognize that we are not free to pass upon the wisdom of a factual determination by the hearing examiner when supported by substantial evidence, yet we cannot disregard the apparent influence that the restrictive language in Regulation 89.1 may have had on the ultimate factual and legal conclusions which he reached in this case.

Accordingly, we will reverse and remand for further proceedings consistent with this opinion.

## Order

And Now, this 17th day of June, 1983, the adjudication of the Department of General Services, dated

September 15, 1980, is reversed and this case is remanded for proceedings consistent with this opinion. Jurisdiction relinquished.