[Civ. No. 13735. Second Dist., Div. One. Nov. 19, 1942.]

MABEL J. BRADLEY, Respondent, v. CITY OF LOS ANGELES (a Municipal Corporation) et al., Appellants.

Ray L. Chesebro, City Attorney, and Robert J. Stahl and Edward J. Olstyn, Deputies City Attorney, for Appellants.

Paul Taylor and Bartlett & Kearney for Respondent.

YORK, P. J.—This appeal is prosecuted by the city of Los Angeles and its Department of Pensions and Board of Pension Commissioners from a judgment of the trial court ordering a peremptory writ of mandate to issue, directing the board to pay a pension to petitioner, Mabel J. Bradley.

Prior to instituting the instant proceeding in mandamus, Mrs. Bradley filed with the Board of Pension Commissioners her application for a widow's pension pursuant to the provisions of article XVII of the charter of the city of Los Angeles, which application was denied by said board.

The petition for the writ contained the following allegations of fact: Petitioner is the widow of Walter N. Bradley who died on December 30, 1939. Said decedent became a member of the police department of the city of Los Angeles on the 18th of February, 1927, and from that date until the day of his death he paid into the pension fund of said city 4% of the salary received by him as such officer. On the 13th of June, 1933, while engaged in the discharge of his duties as a police officer, decedent was bitten by a dog afflicted with rabies and received through the department of health of said city fourteen Pasteur treatments for said dog bite, suffering a severe reaction from said treatments. As a result of said treatments, decedent's general health became poor and his nervous system suffered; his condition became progressively worse subsequent to June 23, 1933, and on July 26, 1938, he was declared to be ill on duty and was so carried on the rolls of said police department until the 26th day of July, 1939; on August 7, 1939, decedent filed application for a pension, which application was pending at the time of his death on December 30, 1939, when "by reason of the injuries so received in line of duty, (he) had become so

ill in body and his nervous system so injured that he became mentally unbalanced, and as the result thereof, on said 30th of December, 1939, took his own life.''

Appellants answered the petition and by way of defense alleged that the cause of the death of said Walter N. Bradley was ''cirrhosis of the liver, causing an ascites making necessary frequent paracentesis abdominis,'' and that this condition was in nowise attributable to any injury or sickness incurred by said Walter N. Bradley in the discharge of his duties as a police officer.

It was found by the court upon this issue:

''VI. That on the 13th day of June, 1933, while the said Walter N. Bradley was in the service of the City of Los Angeles and engaged in the discharge of his duties as a member of the Police Department of said City, he was bitten by a dog afflicted with rabies; that thereafter between June 14 and June 23, 1933, inclusive, the Department of Health of respondent City of Los Angeles gave to the said Walter N. Bradley fourteen Pasteur treatments; that the said Walter N. Bradley suffered a severe reaction from said treatments and as the result thereof his general health became poor and his nervous system suffered; that said conditions became progressively worse subsequent to June 23, 1933, and as a result of said conditions on or about the 26th day of July, 1938, he was declared by said respondent City of Los Angeles to be ill on duty and was so carried upon the rolls of said police department of said City of Los Angeles until the 26th day of July, 1939; that from July 26th, 1939, to the date of his death the said Walter N. Bradley was a member of said police department but on account of his illness was unable to perform any duties and received no pay from the said respondent City of Los Angeles; that on the 7th day of August, 1939, the said Walter N. Bradley filed an application for a pension with the said respondent Board of Pension Commissioners, which application was still pending before said Board at the time of the death of the said Walter N. Bradley; that by the 31st day of December, 1939, the said Walter N. Bradley, by reason of the injuries so received in line of duty, *on aggravation and acceleration of a pre-existing disease,* had become so ill in body and his nervous system so injured that he became mentally unbalanced and as the result thereof, on said 31st day of December, 1939, took his own life; *that Walter N. Bradley died as a result of the in-*

*juries received through the dog bite coupled with the Pasteur treatments."* (Emphasis added.)

 Appellants urge in their opening brief that "There is no competent evidence in this case to sustain the finding that the cirrhosis of the liver from which officer Bradley died was caused by the Pasteur treatments," and therefore, "The decision of the trial court in this case is contrary to unanimous medical opinion."

Respondents in their reply brief contend that Officer Bradley's health was shown to have deteriorated steadily from the time in 1933 when he was bitten by the dog afflicted with rabies and was given the Pasteur treatments. "Whether or not he also had cirrhosis of the liver, his death was caused by his insane act of jumping from the window at the Veterans' Hospital, or falling from it, and the evidence shows that that act was directly attributable to the reaction from the Pasteur treatments. It seems clear therefore that the finding of the court that the officer died as a result of the injuries received through the dog bite, coupled with the Pasteur treatments, is sufficiently supported. . . ."

The judge, who presided at the trial of the instant litigation, prepared a memorandum for decision in which he summarized both the oral and documentary evidence with clarity and fairness, and cited the law applicable thereto in support of his findings and judgment in favor of the petitioner. Following we quote said memorandum:

"Petitioner, widow of Walter N. Bradley, a late member of the Police Department of the City of Los Angeles, seeks a writ of mandate commanding respondents to grant her a pension as such widow under provisions of the City Charter.

"Section 183 of the Charter of the City of Los Angeles provides as follows in part: 'Whenever any member of the . . . Police Department shall die as a result of any injury received during the performance of his duty, or from sickness caused by the discharge of such duty . . . then an annual pension shall be paid in equal monthly installments to his widow . . . in an amount equal to one-half ($\frac{1}{2}$) of the average monthly rate of salary which such deceased member shall have received in such Department during the three years immediately preceding the time of his death.'

"Petitioner and Walter N. Bradley were married on November 20, 1920, and on February 18, 1927, the latter became a member of the Police Department of the City of Los

Angeles, and remained such until his death on December 31, 1939. The average monthly rate of salary attached to the rank or position held by him and received by him in such department was $200.00 per month for three years prior to July 25, 1939, after which date he was absent from duty on leave granted on account of illness and inability to perform services, and received no pay from said City. At the time of his death there was pending his application for a pension and hearing had been set thereon for January 8, 1940.

"At the time he became a member of the police department, Walter N. Bradley was about thirty years of age and had passed the physical and medical tests and been accepted, and was in good health physically and mentally so far as was then apparent or known, and weighed about 180 or 185 pounds, being 5 feet 11 inches in height.

"The evidence disclosed that outside of superficial disturbances his bodily health was sound until about January 18, 1931, when he was involved in an auto collision while on duty in a police car and suffered a blow and bruises to his lower chest and abdomen from violent contact with the steering wheel, from which, after two weeks, there was an uneventful recovery.

"At a regular medical check-up examination of the Department on May 31, 1932, he weighed 188 pounds and it was discovered that he had an 'enlarged liver, three fingers below costal margin.'

"On June 13, 1933, he was bitten in several places on his body by a dog afflicted by 'positive rabies.' The puncture wounds inflicted by the dog bite were cauterized immediately and at his request he was given the regular course of fourteen Pasteur treatments by Dr. Mona E. Bettin of the City Health Department, beginning June 14 and ending on June 23, 1933. On the night of the day on which the first two treatments were given, he frothed at the mouth and became and remained unconscious for about three hours. This was reported to Dr. Bettin who later entered a note on her records as follows: 'Very severe reaction.' He was afflicted with a sick sensation after each subsequent treatment and a soreness in the region of injection for four or five days after treatments were given, and within two or three months thereafter he began to show listlessness, loss of physical energy and desire to do the usual chores and garden work around his home, and a loss of desire to go fishing as had been his custom. He became 'broody' and 'crabby,'

and showed loss of mental alertness. He also lost capacity to consummate marital relations, and his weight decreased steadily, and a medical examination on August 20, 1934, showed his weight to be 165 pounds; and that he had a 'markedly enlarged liver.' He continued to perform his duties as a police officer and on May 16, 1936, he was again examined and his weight was recorded as 158 pounds, and the 'enlargement of the liver' noted. On September 1, 1937, he was assigned to duty on the patrol wagon and at the Central City Jail, and later to the fingerprint department at the Jail because of weakened physical condition, where he remained on duty until July 27, 1938, when he was ordered to bed in the Receiving Hospital, off duty, following an injury received on July 25 at the jail during a struggle with a prisoner, when he slipped and fell across a bench striking his side and abdomen. Just before this event, and about June 1, 1938, he had been required by the Department to take a two weeks' course in physical training and on his completion of such training he complained of exhaustion and physical weakness, and began to lose more weight, his limbs and chest becoming thinner, but his abdomen beginning to get larger. On July 25, 1938, an examination revealed a swelling of the abdomen, with an enlarged liver with 'ascites' and some 'oedema of lower extremities.' From that time on to September 25, 1938, he remained in the Receiving Hospital and every three or four days fluid was extracted from his abdominal cavity to an amount varying from 2000 to 10,000 cc. or approximately 2 to 10 quarts. On November 4, 1938, a medical examination revealed his weight to be 138 pounds and that he was suffering from 'portal cirrhosis.' On August 9th, 18th and 23rd, 1939, respectively, he was examined by three physicians for the Pension Board, and each physician diagnosed his illness to be cirrhosis of the liver or 'portal cirrhosis.' After his removal to the Veterans' Hospital at Sawtelle on September 15, 1939, he was given treatments for the cirrhosis, and the accumulating fluid was, at similar intervals, removed from his abdominal cavity until a few days before December 31, 1939, when he was taken from the general ward and placed in a special ward where patients who are expected to die at any moment are placed. He became aware of this ominous situation and told his wife they couldn't kid him any longer about getting well, and on December 31, 1939, he opened the screen on the window of his

room and jumped or fell to the ground below and died immediately. During the last days of his life, he was emaciated in body, other than the abdominal swelling, weak in mind and at times possessed of hallucinations, and on the afternoon of the day he died he was irrational and wandering in mind while his wife was visiting him. A medical expert stated in answer to a question based on these facts that Bradley was of unsound mind at the time he jumped from the window.

"Petitioner contends that by reason and as a direct result of the dog bite and Pasteur treatments in June, 1933, her husband 'died as the result of an injury received during the performance of his duty,' and that, therefore, she is entitled to the pension of $100 per month provided for in the City Charter.

"Respondents claim on the other hand that petitioner's husband died as the result of a disease denominated as 'portal cirrhosis,' or 'cirrhosis of the liver,' or 'Laennec cirrhosis of liver,' all being names of the same disease.

"Neither party stressed the factor of suicide which injected itself into this patient's history at the end, as each appeared to consider that the apparent suicide was only an incident to death, and not the proximate cause thereof, on the theory that the act of the patient in jumping from the window was not a wilful, deliberate and sane act, but was that of a person of unsound mind *in extremis*, irresistibly impelled by the disease itself to meet and hasten the approaching end. In this theory I concur. Walter N. Bradley died either because of the injury received through the bite of the mad dog coupled with the Pasteur treatments, or because of the disease called cirrhosis of the liver alone. I eliminate, therefore, the factor of suicide from the chain of causation, and will base decision herein on the history of the case from its true beginning to the death of the patient.

"The policy of this state is to construe provisions of the character here involved liberally, serving as they do a beneficial purpose. (*Casserly* v. *City of Oakland*, 215 Cal. 600, 603 [12 P.2d 425].)

"The word 'injury' as used in the charter hereinabove quoted is not limited in its interpretation to injuries caused by external violence, physical force or as a result of accident in the sense that the word is commonly used and understood, but it is given a much broader and more liberal meaning. So construed it includes any injury or disease arising

out of and in the course of the employment, which causes incapacity or death. The word 'injury' has reference not to some break in some part of the body or some wound thereon, or the like, but rather to consequences or disability that result therefrom. Courts are practically unanimous in holding that the word should be given a broad and liberal construction in order that the humane purpose of the enactment may be realized. Such legislation should be applied fairly and broadly with a view to confer the benefits intended. (*Casserly* v. *City of Oakland*, supra.)

"Acceleration or aggravation of a pre-existing disease is an injury in the occupation causing such acceleration. (*George L. Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587, 594 [200 P. 17], and cases there cited.) In the case just cited, a truck driver, afflicted with a disease of the heart, fell from his moving truck and was crushed by a wheel passing over his body. In affirming an award of the Industrial Accident Commission, the Supreme Court said on pages 593, 594: 'It must be confessed, however, that the erratic movement of the truck, and the absence of any direct evidence of physical conditions on the road to account for it would strongly suggest the probability that the driver was suddenly incapacitated to intelligently steer his truck, and that its irregular course and the consequent fall was at least contributed to by this condition of the driver.

" 'Even conceding this to be the case, it does not necessarily follow that the accident cannot be attributed to the employment. If the disability, although arising from a chronic heart trouble, was brought on by any strain or excitement incident to the employment, the industrial liability still exists.'

"In the case of *Buckley* v. *Roche*, 214 Cal. 241 [4 P.2d 929], an appeal from a mandate ordering a pension to the widow of a San Francisco police officer was under consideration. The charter of that city provided for a pension to the widow of any police officer killed or injured while in performance of his duties. Buckley, the deceased police officer, was afflicted with a heart trouble and had been assigned for duty to the police photograph gallery on the roof of the Hall of Justice, which was reached by a special stairway of two flights of twelve steps each. On the morning of his death, Buckley climbed these stairways and entered upon his work in the gallery and shortly thereafter he suffered a heart

spasm and within a few hours died. In affirming the mandate, the Supreme Court said on page 245:

" 'The fact that Buckley had at the time a previous heart affliction did not of itself defeat his wife's application for a pension if the exertion in climbing the stairs precipitated his death by aggravating this condition. Under the conditions the injury was such as would bring it within the terms of the charter and entitle his widow to a pension in case of his death from said injury. This principle has frequently been applied in cases arising under the Workmen's Compensation Act, and we can see no distinguishable difference from such cases and those arising under said charter.'

"In the same case, after citing and quoting from the *Eastman case, supra,* the court repeats its quotations from the case of *In re Madden,* 222 Mass. 487 [111 N.E. 379, L.R.A. 1916D, 1000], as follows, on page 246:

" 'It is the hazard of the employment acting upon the particular employee in his condition of health, and not what the hazard would be if acting on a healthy employee. . . . Whatever predisposing physical condition may exist, if the employment is the immediate occasion of the injury, it arises out of the employment because it develops within it.'

"The analogy between the case at bar and those just above reviewed and cited is obvious. In his then condition of health, under affliction of an enlarged liver, irrespective of its source of causation, Bradley, during performance of his duties, was bitten by a dog afflicted with rabies, producing an immediate condition which threatened his life. To counteract the effect of rabies infection the Pasteur treatments were given with the results outlined in the history above given. This history and the expert medical testimony convinces me that the dog bite and the Pasteur treatments, in combination, so accelerated and aggravated the pre-existing disease of the liver that it ultimately and in direct sequence resulted in the death of the patient. Bradley's employment and discharge of duty as a police officer was the immediate occasion of the injury—the dog bite—and that injury arising and developing within his employment, accelerated, and by continual unbroken process precipitated his death. It follows, therefore, that it should be, and it is herein found that Walter N. Bradley died as a result of an injury as hereinabove defined, received during the performance of his duty as a member of the Police Department of the City of Los Angeles.

"Petitioner is entitled to receive the pension in such case provided by the Charter, and to a peremptory writ of mandate commanding respondents to grant her such pension; and it is so ordered. . . ."

A careful examination of the record herein discloses sufficient evidence to support the findings and judgment.

The judgment is affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied December 14, 1942, and appellants' petition for a hearing by the Supreme Court was denied January 14, 1943.