Margaret M. Prendergast, Appellant, v. Retirement Board of Firemen's Annuity and Benefit Fund of Chicago, Appellee.

Gen. No. 43,073.

Heard in the second division of this court for the first district at the June term, 1944.

Opinion filed April 19, 1945. Released for publication May 2, 1945.

EMMETT M. McDONALD and EARL WILCOX, both of Chicago, for appellant.

BARNET HODES, Corporation Counsel, and GEORGE F. MULLIGAN, Assistant Corporation Counsel, for appellee; GEORGE F. MULLIGAN, JR., of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

The petitioner, Margaret M. Prendergast, appeals from an order of the circuit court quashing a writ of certiorari issued upon her petition to review a record of the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago which had denied her application to have her name placed upon the compensation annuity roll of the board as a widow annuitant on the ground that she is the widow of a deceased fireman who died as the result of injuries sustained by him in the line of duty.

The facts disclose that her husband, Joseph M. Prendergast, was appointed a fireman in the Fire Department of the City of Chicago during the summer of 1935 and served in that capacity until the date of his death, February 8, 1942. January 23, 1942 he had been ordered to clean the windows of the bunk room of his company's quarters at 209 North Dearborn street, and while standing on top of a high steam radiator and attempting to open the upper portion of a window, he slipped and violently fell astride the radiator, sustaining injury to his testicles and laceration of the scrotum. Two firemen in his squad immediately helped him to bed and examined his injuries. He was then sent to the Henrotin Hospital, received first aid treatment and against the advice of

the attending physician who wanted him to remain in the hospital, he proceeded to his home, under instructions to rest, continue application of hot moist compresses and place himself in the care of his family physician. On the succeeding day and several times thereafter, until February 6, he returned to the hospital for further treatment. Early in the morning of February 8 he collapsed in the bathroom of his home and died shortly thereafter.

The act creating the Firemen's Annuity and Benefit Fund of Chicago (Ill. Rev. Stat. 1943, ch. 24, pars. 944.1 *et seq.* [Jones Ill. Stats. Ann. 100.286 *et seq.*]) provides for two classes of annuities for widows: (1) ordinary annuity, which is payable to the widow of a fireman who has died as the result of any cause other than an injury received in the performance of his duty and varies in amount according to the length of service of the fireman and the amount of his contribution to the fund; and (2) compensation annuity, as provided in section 33 of the Act (par. 944.33 [Jones Ill. Stats. Ann. 100.318]), which consists of an amount equal to the difference between the widow's ordinary annuity and the sum of $125 a month. In the instant case petitioner was granted ordinary annuity of $45 a month for herself and $10 a month for each of her three minor children, but her claim for compensation annuity, involving the question whether or not her husband's death resulted from injuries received in the performance of duty, was denied pursuant to five hearings before the board, where both lay and medical witnesses testified with respect to petitioner's claim that a causal connection existed between the injuries sustained by Prendergast in the line of duty and the physical conditions from which he died. Finally, on November 17, 1942, the board of trustees, by a division of four to three, voted that petitioner's compensation annuity be denied, and there-

after, April 27, 1943, she filed her petition for a writ of certiorari to review the proceedings.

The material evidence submitted to the board included the coroner's photostatic copy of a death certificate stating that an inquest had been held after Prendergast's death February 8, 1942 and certifying that the cause of death was the "result of hemorrhagic pancreatitis and hemorrhage into left adrenal gland due to external violence"; also a copy of the medical report of Henrotin Hospital submitted by Dr. A. J. Graham, giving a history of the case which stated that Prendergast was injured while washing windows through an accidental fall from a radiator, "straddling radiator as he fell," causing him to sustain injury to his testicles and laceration of the scrotum. The physician noted that the patient was "suffering intense pain, as indicated by 'drawn' facial expression—and lower right side of abdomen—." A notation on the record indicates that Prendergast returned to the hospital on the succeeding day, January 24, "suffering pain apparently as intense as previous day." A notation dated January 27, 1942 indicated that the patient had returned on that day and that his "symptoms [were] not perceptibly changed." February 2 and again February 6 he returned to the hospital, and on the latter date one fourth grain of phenobarbital was prescribed.

Petitioner, appearing as a witness in her own behalf, testified that her husband was in good health at the time of his injury; that after the accident he was not confined to bed because he had to go back and forth to the hospital; that he "did not go anywhere else except a couple of times he took the baby out for a walk and a couple of mornings he went to Mass; went nowhere else; did not complain of receiving any injury during any of these trips; . . . subject to fainting and spells of weakness after accident and he

used to sometimes act like he was crazy with pain; two or three times he fainted and had a lot of pain; was in pain two or three times a day but the rest of the time was all right. When he went to hospital he came right home. Had terrible pain in stomach; would scream with pain; took capsules that Doctor Graham gave him to stop pain; had extreme pain three or four times during day and maybe once at night. Died when he got up at night and went to bathroom where he fell to floor and never regained consciousness. . . . From the time of injury to death, my husband on numerous occasions fell in a dead faint about the home as well as in the bathroom thereof. . . . Mr. Prendergast had not been drinking for two years. If he was drinking, I certainly did not know it." M. J. Corrigan, fire commissioner, stated: "I know that he [Prendergast] hadn't been drinking for the last two years."

Roy McCarthy, a member of his fire squad, testified that he saw Prendergast standing on the radiator washing windows in the bunk room, heard him fall, and together with Lt. Edward L. Piper, assisted him to bed and examined his injuries; that he was in good physical condition up to the time of the accident; that after the accident "he was in pain. He lay down there and gasped after his fall."

Piper stated that after the fall Prendergast was conscious and in pain. "He lay there for awhile till he got his breath. He had a hard time breathing. Then he got up and walked awhile; he said he was in pain. . . . He had pain in the groin. . . . Prendergast was in good physical condition before that time and his health appeared good; he was active and he never complained of any sickness."

Dr. Coye C. Mason, the coroner's physician, performed an autopsy on Prendergast and made the following findings: "He had hemorrhagic pancreatitis, *traumatic in origin.* There are two causes of pancre-

atitis, one infectious and the other traumatic. The infectious type is due usually to obstructions of the pancreatic duct, usually a gallstone. In this case, the entire gall bladder tract and the various bile ducts were dissected out and in no instance could I find such a condition of infection. There were lacerations which are accompanied with trauma and the amount of hemorrhage into the abdomen related with such findings in the abdominal cavity was consistent with traumatic pancreatitis. Some kind of injury to the abdomen would produce this kind of pancreatitis. The autopsy indicated an injury and ecchymosis in the pelvic region resulting from that injury. I think there was an ecchymosis. That is a discoloration with hemorrhage in the right inguinal area, in the groin, the right groin. . . . A sample of blood was also taken for an alcoholic determination and it was found 0.07 per cent grain alcohol was found, which is not sufficient to kill an individual. . . . In my opinion his death came from this hemorrhage. To my knowledge the amount of alcohol shown in the toxicological report could not have been an influencing cause for the existence of the hemorrhage and I looked for such things.'' (Italics ours.)

On redirect examination by the attorney for the board, Dr. Mason testified that ''the injury caused by Prendergast's striking his stomach or that portion of his body on a radiator sixteen days before death can be associated with the cause of his death. I went over that in my mind when I was summing up this case and from the history that I was able to gain from the family as to the man's complaints leading up to his death I can associate the pancreatitis with his complaints, because when we opened the abdomen there were multiple areas throughout the abdomen of necrosis of the tissues . . . and every time you get one of these necrotic areas in the abdomen he would get pain, and as I understand, he went to his doctor

and complained of this pain occasionally and it was that acute abdominal pain in the home that caused him so much grief. . . . The pancreas was lacerated and the juices are thrown out into the abdomen and cause pains of every organ they come in contact with . . . . Considering the relative action of this organ it is possible for a man having the condition described to be able to walk around, go down town and go out on the street. In other words, in my opinion, this hemorrhagic condition was a gradual development following the trauma and not a rapid development. . . . A pain in the abdomen on the day of the injury could have escaped the doctor's notice because pain from an injury to the testicle is extreme at the time. His complaints later were referable to the abdomen. The only way I can explain these dizzy spells is injury to the adrenal gland. When I examined the body at post he had a black eye on the right side. The color was fairly intense. It was of recent origin. There were three lacerations of the skin of the forehead.''

Dr. H. L. Foltz, another physician called by the board, testified that he treated Prendergast for a small laceration in the scalp on the Saturday preceding his death. It was not bleeding at the time. Dr. Foltz dressed and cleaned, but did not suture, the wound. He was called to Prendergast's home at 2:00 a. m. Sunday morning and found him dead on the bathroom floor. The witness testified that Prendergast did not appear to be under the influence of liquor when he saw him. ''I did not smell any.'' In response to further examination Dr. Foltz testified that he was familiar with the cause given for Prendergast's death and stated that he could have been suffering from hemorrhagic pancreatitis two weeks prior to the date he examined him. ''In case the hemorrhagic pancreatitis was a slow hemorrhage it would be possible for the man to get around for two weeks

after the accident. Hemorrhagic pancreatitis could have caused the incoherence which I observed. I would say that the abrasion to the head could very well be caused by a fall due to a dizzy spell and I would say this physical condition as I saw it could very possibly be due to Prendergast's coming out of this dizzy spell."

Dr. John A. Graham, who first attended Prendergast at the Henrotin Hospital shortly after the accident occurred, elicited from him the history of the accident, and indicated on the hospital records that he fell, striking a radiator, while washing a window at the fire house. Dr. Graham testified that he complained of very severe pain in the testicles, especially on the right side. On examination he found bruises in that region and stated that he "could see the patient was suffering intense pain by the drawn expression on his face and he kept putting his hand to his side. I examined him and told him I wanted him to go up to bed which he did not do. Then I prescribed hot compresses and that he remain in bed at home. I saw him on the 24th and the symptoms were not perceptibly changed. He complained of very severe pain and I again advised him to come in, and on the 27th he returned and same advice given as to treatment and hospitalization with no perceptible change. He returned on the 6th of February and was prescribed for by my associate because I was in Mexico. . . . Now this man's pain was characteristic of pancreatitis, except it was low down. There is no pain worse than pancreatitis. If a man ever has pancreatitis it compares favorably with labor pain. It is excruciating pain and doubles them up. This man was suffering excruciating pain. I could tell it in his face." Counsel for the board then interrogated the witness as follows: "Q. What are the general causes of pancreatitis, Doctor? That is, hemorrhagic pancreatitis. A. Oh, I couldn't tell you. An

injury may produce it. That I couldn't tell you. The pancreas is one of our eyesores, and it is pretty much unexplored yet. It is a hard thing to tell that. Q. What is the difference between ordinary pancreatitis and hemorrhagic pancreatitis? A. You mean a chronic pancreatitis probably. Q. Well, one that could be caused from a blood clot, which you assume could have caused it. A. Well, we would consider that a hemorrhagic pancreatitis, and it hits the patient very quick and is very rapidly fatal. The pain and the symptoms stand out and the pain is very excruciating. Q. Then, Doctor, in answer to that question of associating the cause of death with the injury, remembering that two weeks elapsed between the injury and the cause of death, you say that that is possible? A. It is not possible. It is quite probable. Q. Probable. A. Because we consider that a disease that kills within two weeks quite an acute affair. Q. Acute? A. Yes. Q. When would the existence of the hemorrhagic pancreatitis first manifest itself prior to the death of February 8th? A. Well, as I look back on it now, those symptoms he complained of after coming in the second time, or the first time, were, in my opinion, probably the forerunner of hemorrhagic pancreatitis.''

Dr. M. V. Gino, called as a witness by the board, stated that he saw Prendergast only once, early in February. He testified that ''I put a suture in his head and gave him some paraldehyde to quiet him down. The scalp wound was not very large and was right in the occipital region. . . . It was about two or three in the afternoon and the wound was a couple hours old. The wound was about one-half or three-quarters inch in length. I think it was on Saturday, the 7th. He died the next day. There was a radiator, bath tub, wash basin and usual fixtures in bathroom. All I can recall is suturing the wound . . . . Prendergast was pretty restless. He was threshing around in bed.''

■ The law is well settled that on a common-law writ of certiorari the only province of the trial court is to consider the record and ascertain whether the board had jurisdiction, whether it exceeded its jurisdiction, whether it proceeded according to law and acted on evidence, and whether there is anything in the record which fairly tends to sustain the action of the board; and where the inferior tribunal is not arbitrary in its finding and there is evidence in the record of its proceedings which fairly tends to support the finding, a reviewing court is not justified in substituting its judgment for the discretion and judgment of the inferior tribunal. *Kilroy v. Retirement Board of Park Policemen's Annuity and Benefit Fund*, 297 Ill. App. 261. The question therefore presented is whether the board in the instant proceeding was justified in finding, as it did, that plaintiff had failed to produce satisfactory evidence as to the causal connection between the accident and death. In other words, was there any evidence in the record which fairly tends to sustain the action of the board? We have heretofore set forth the evidence at considerable length. Aside from the testimony of Mrs. Prendergast and two firemen, the evidence consisted of hospital records, the coroner's certificate of death and the medical testimony of four physicians. The coroner's death certificate and the medical testimony clearly show that Prendergast died as a result of complications brought on by hemorrhage of the pancreas following injuries sustained by him on January 23. No medical testimony to the contrary was introduced. As stated in *Peters v. Sacramento City Employees' Retirement System*, 27 Cal. App. (2d) 10, 80 P. (2d) 179, "in cases of this character it is imperative to rely upon the testimony of those skilled in the science concerning which they are called upon to express an opinion, and their conclusion is conclusive on the question. Thus in *Simpson Construction Co. v. Industrial Accident Commission*,

74 Cal. App. 239, 240 P. 58, it was held that (page 59) 'whenever the subject under consideration is one within the knowledge of experts only, and is not within the common knowledge of laymen, the expert evidence is conclusive upon the question in issue.' '' We think this is a fair expression of the rule to be invoked in cases of this kind. Three witnesses testified that Prendergast was in good condition before the accident, and there is no evidence to the contrary. He was active and complained of no illness. The coroner's physician found that death was caused by hemorrhagic pancreatitis, traumatic in origin. His testimony, based upon the autopsy performed on Prendergast, definitely excluded the infectious type of pancreatitis. He stated that the autopsy indicated an injury and that the hemorrhagic condition was a gradual condition following the trauma rather than a rapid development. Dr. Graham described the excruciating pain as characteristic of pancreatitis and was of opinion that an injury could produce that condition. When asked whether it was possible to associate the cause of death with the injury the witness replied: "It is not possible. It is quite probable." Counsel for the respondent profess to be confused over the meaning of the answer, but it seems to us quite clear that it indicates a strong likelihood of the causal connection between the injury and death. Prendergast was approximately 36 years old at the time of the accident. He was admittedly engaged in the performance of his duty. The record clearly shows that symptoms of the injury from which he subsequently died began to manifest themselves immediately after he was injured. Dr. Mason stated that pain in the abdomen following the injury could have escaped the attending physician's notice because pain from an injury to the testicle is extreme at the time, and he pointed out that Prendergast's complaints later were referable to the abdomen. We have carefully ex-

amined the entire record in this proceeding. Nothing therein suggests even remotely that Prendergast died from any other cause than a ruptured pancreas, and all the evidence fairly tends to prove that such injury resulted from the accident in the fire house. We find no evidence tending to sustain the action of the board, as expressed by the majority of four who voted in favor of denying the petition for compensation annuity.

■ For the reasons indicated, the order of the circuit court, quashing the writ, is reversed, and the cause is remanded with directions that the decision of the board be quashed and that an order be entered granting petitioner her statutory right to a widow's compensation annuity, as prayed.

*Order reversed and cause remanded with directions.*

SULLIVAN, P. J., and SCANLAN, J., concur.