Vivian O'Brien, Appellee, v. Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago, Appellant.

## Gen. No. 45,344.

Opinion filed June 18, 1951. Rehearing denied June 29, 1951. Released for publication July 30, 1951.

JOHN J. MORTIMER, Corporation Counsel, and GEORGE F. MULLIGAN, JR., Assistant Corporation Counsel, both of Chicago, for appellant.

THOMAS H. ALCOCK, of Chicago, for appellee.

MR. JUSTICE FEINBERG delivered the opinion of the court.

From an adverse order quashing the return to the writ of certiorari, defendant appeals.

Plaintiff filed her petition for certiorari in the superior court of Cook county to review the decision of the defendant Retirement Board denying compensation to her. It appears that plaintiff, the widow of Howard T. O'Brien, deceased, filed her application with the defendant Board for compensation annuity under section 33 of the Firemen's Annuity and Benefit Act (Ill. Rev. Stat. 1949, ch. 24, par. 944.33) [Jones Ill. Stats. Ann. 100.318], which provides for the payment of compensation annuity to the widow of a fireman, "whose death shall result from the performance of an act or acts of duty." The Act specifically provides for review by the court by certiorari.

The controlling question presented upon this appeal is whether there is any evidence in the record reasonably tending to sustain the decision of the Board. This necessitates a detailed statement of the evidence.

The record discloses the following facts: The deceased was a captain attached to the Fire Department

631

of the City of Chicago, who died October 24, 1947, at the Veterans' Administration Hospital in Phoenix, Arizona; that on December 22, 1946, he responded to an alarm of fire in a match factory, where he was overcome by sulphur fumes inhaled at said fire; that prior to the fire in question, deceased had a medical history, which included surgery involving the removal of a tumor in the right axillary region on April 21, 1934, and again on April 22, 1936, additional surgery for the removal of another axillary tumor; that on March 17, 1942, at the Mayo Clinic surgery was performed for a duodenal ulcer, and three lymph nodes were removed from the right supraclavicular area, which disclosed upon laboratory tests a grade 3 cancer with areas of calcification; that on August 7, 1944, he returned to the Mayo Clinic, where X-rays showed the presence of calcified nodes; that after the surgery referred to, he resumed his duties as a fireman; and that he had gained in weight and apparently was in good health until his exposure to the sulphur fumes at the fire in question.

The Veterans' Hospital in Phoenix forwarded a certificate of death to the Retirement Board, in which it certified under the heading Immediate Cause of Death: ''Peripheral Circulatory Collapse. Due to Cancer of Lung. Findings based on autopsy.'' The reference to the findings based on autopsy was an error and was corrected by an affidavit of the clinical director of the Veterans' Administration Hospital in Phoenix, disclosing there was no autopsy held.

Because of his state of ill-being following the fire, deceased entered the Mayo Clinic on January 20, 1947.

Dr. A. M. Olsen testified by deposition that he practiced medicine for fifteen years in the State of Minnesota and was on the staff of the Mayo Clinic since January 1, 1940; that he specialized in internal medicine and diseases of the chest and was following that

specialty at the clinic; that he examined X-rays taken at the clinic and in detail revealed the clinic medical record of deceased; that the X-rays of the chest revealed a bilateral inflammatory process involving the lower portions of both lungs, more prominent on the right side than on the left; that the pulmonary lesions represented an inflammatory process possibly aspirational, and that the X-ray findings were consistent with an X-ray diagnosis of bronchiectasis; that deceased left the hospital, and again returned on March 12, 1947; that he was then completely re-examined; that the X-ray films did not show any appreciable change from those made in the January visit; that a bronchoscopic examination was done on March 18, 1947, by Dr. Smith; that large amounts of thick tenacious secretion in both lower bronchi found secretion was aspirated; that broncho-mucous membrane was much redder than normal; that no evidence of bronchial tumor could be visualized; that all secretions were sent to the laboratory for cellular study and more smears for cultural tubular; that cultures were also made for fungular; that Dr. Smith's diagnosis was chronic bronchitis; that smears made from the secretion at the bronchostomy were negative for acid fastness,—negative for tuberculosis; that cultures of the sputum were negative for pathogenic fungi. This witness, examined and cross-examined, testified that the symptoms presented at the time of the visits of deceased in January and March, 1947, could well be related to his exposure to fumes and fire on December 22, 1946; that deceased had a chronic cough prior to the fire, but "his symptoms were greatly aggravated after the inhalation of fumes on December 22"; that the lymph nodes which were removed in 1942 were either a healed tuberculosis of the lymph nodes or a malignancy that was very clearly demonstrated at the time these lymph nodes were removed, but it would

633

be most unusual for a person to live and be as well as Mr. O'Brien was for a period of almost five years after the malignant nodes were detected; that this is the reason why he was reluctant to make the assumption that deceased's pulmonary symptoms were related to his malignancy, and why they entertained the possibility that the chronic bronchial condition "aggravated by the inhalation of fumes" might have been responsible for the subsequent development of a progressive inflammation of the lungs as medic features and circulatory failure, as described in the death certificate.

Dr. Unger testified that he practiced medicine since 1915 in the City of Chicago and has been associate professor at Northwestern University Medical School since 1927, teaching internal medicine—diagnostics and allergy; that he specialized in that field since 1920; that he had considerable experience in the taking and reading of X-rays; that deceased was his patient from May 20, 1947, until August 6, 1947; that he took the patient's history, which disclosed that he inhaled an overdose of sulphur fumes at a fire in December, 1946; that there was a complaint of violent attacks during the night following the fire; that he would wheeze and be short of breath and cough; that he gave a history of surgery, involving removal of a tumor from the right axilla and in 1942 the removal of a duodenal ulcer and the removal of malignant nodules from the right clavicular bone, which was followed by X-ray treatments twice a week for twelve weeks; that upon his examination of deceased in 1947, he found shortness of breath, coughing and wheezing; that deceased weighed 134 pounds and maintained that weight until August 6, 1947, when he weighed 132 pounds; that the examination included fluoroscope, X-rays, skin tests and also tests for asthma; that he was in the hospital from July 16 to July 30; that his condition remained the same; that on August 6 he

634

indicated a desire to go to Phoenix and was discharged from the hospital; that in his opinion deceased had fibrosis of the lungs and asthma; that the fibrosis of the lungs was caused by inhalation of some type of fumes—probably the sulphur fumes inhaled in December, 1946; that this opinion is based on the history and X-ray findings and on the electrocardiograph; that the fact that he maintained his weight throughout the period of his entire medical history was good evidence against suggestion of cancer of the lungs; that he ruled out cancer because of the excellent health of the patient for a period of five years following the removal of the malignant growth; that following his examination at the Mayo Clinic in 1944, deceased had actually gained weight, which could not have occurred with cancer, and the history of his examination at the Mayo Clinic and the findings there made, as shown by the record, influenced him in the conclusion that deceased's cancer of 1942 had been completely removed or at least arrested; that there was a causal connection between the inhalation of the fumes at the fire of December, 1946, and the death of deceased in October, 1947, and that it was most reasonable to assume death was due to right heart strain, cor pulmonale, which in turn was due to fibrosis of the lungs, which in turn was due to inhalation of noxious fumes at the fire in which he inhaled much smoke and sulphur; that his examination of the medical record of the Veterans' Hospital at Phoenix disclosed the deceased had, about eleven days before death, a blood count, red cells, 4,460,000, and hemoglobin of 92%; that it was, in his opinion, almost impossible for the deceased to have the blood count indicated and die of cancer of the lung.

Dr. Barth, a practicing physician in Chicago, and a specialist in radiology, which deals with the diagnosis of and treatment of disease by means of X-ray and radium, testified that in his opinion the findings as

635

to the condition in the lower part of the lung would be unlikely for malignancy; that the findings all seemed concerned with an inflammatory process; that in his opinion that type of exposure, in a previously injured or previously diseased lung, smoke or fumes "would aggravate a pre-existing condition," and the condition could have been caused by irritation of noxious fumes at the fire, and the condition is more likely an inflammatory condition than a malignancy; that if there was a malignancy, it would have made itself known sooner than five years since the original history of malignancy.

As against all of the foregoing testimony, there appears the evidence of Dr. Charles Galante, a practicing physician in Chicago, specializing in roentgenology, called by defendant as a witness. Testifying to the condition disclosed in the X-rays, he stated that he found lesions in the lower third of the right lung and areas of calcification in the upper chest; that the inflammatory change could be due to any defect, to bacteria, an irritation or possibly a malignancy; *that he did not suppose there was a malignancy, there was not enough evidence, but correlated with other findings it might mean something; that it was possible it was due to a malignancy but it must have other corroborating evidence;* that he would not consider that a form of fibrosis would cause a nodule of that kind; that he has seen fibrotic nodules of that shape; that in this case it was entirely different from the other lesions he had been looking at, which would make him lean a little toward malignancy, *but he could not say that it was.*

There is the unsworn statement of Dr. Sullivan, physician for the defendant Board, who stated that fibrosis of the lungs is not caused by inhalation of smoke; that bronchial tissue could be weakened by exposure to gas or acid as to make the same susceptible to infection but would not be probable. There is also

636

a letter written by the clinical director of the Veterans' Hospital in Phoenix addressed to the defendant Board, giving a history of the admission of the patient to the hospital and a review of the medical record of deceased. That letter throughout is not statements by the clinical director of any fact within his knowledge but is based almost entirely upon hearsay. There does appear in the letter this statement: "Since an autopsy was refused we could not definitely prove that this veteran did have a malignancy." The original medical records of the Veterans' Hospital were produced at the hearing before the defendant Board and were subject to examination at the hearing.

■ The hearsay statements contained in the letter to the Retirement Board and the unsworn statement of Dr. Sullivan cannot be regarded as legal or competent evidence which a Board would have a right to consider or act upon. In *Kilroy v. Retirement Board,* 297 Ill. App. 261, where it appeared that unsworn statements and reports were considered upon the hearing by the Retirement Board, this court (Second Division) said:

"It is true that all the matters and statements contained in said reports were merely 'hearsay' to the board's attorney, that none of the statements contained therein was sworn to, that they contained some statements of a nature calculated to prejudice the board in its disposition of plaintiff's application and that neither said reports nor any portion thereof would be admissible in the trial of a cause in a court of law. It might be said in this connection that 'the niceties and refinements of the procedure or the forms of questions to and the answers of witnesses are not as strictly applied as on a hearing before a judicial body, but the substance of the law must be at all times regarded, as well as the competency and materiality of the evi-

637

dence.' *Schireson v. Walsh*, 354 Ill. 40. Because of the incompetency as evidence of the major portion of their contents, no consideration should or will be given the aforesaid reports in our determination of the question as to whether there was any evidence before the board which fairly tended to disprove plaintiff's claim that there was a causal connection between the injuries received by her husband and his suicide.''

To the same effect is *Bullock v. New York Life Ins. Co.*, 182 Minn. 192, 233 N. W. 858.

In *Van Ort v. Board of Trustees*, 337 Ill. App. 489, in discussing the power of a court to review the finding and decision of the Board, we said:

''The judgment of the Board may not arbitrarily be set aside . . . and can only be quashed where there is no evidence fairly tending to sustain the Board's action.''

The cases all hold that the question before the court upon review is whether there is any evidence in the record reasonably tending to sustain the decision of the Board, *Byrnes v. Retirement Board*, 339 Ill. App. 55; *Carroll v. Houston*, 341 Ill. 531; *Hopkins v. Ames*, 344 Ill. 527.

Even if deceased may have suffered prior to the fire in question with a chronic bronchial condition, Dr. Olsen of the Mayo Clinic, Dr. Barth and Dr. Unger testified definitely that such condition could be aggravated by the inhalation of fumes. In *Peters v. Sacramento City Employees' Retirement System*, 27 Cal. App. (2d) 10, 80 P. (2d) 179, cited in *Prendergast v. Retirement Board*, 325 Ill. App. 638, the deceased was a fireman, who died on his way to the hospital from a fire to which he responded, and an autopsy revealed ''death as a result of coronary sclerosis.'' The Board contended that death was from natural causes, and

that even if the fire did cause his death, it was a risk assumed, for which his widow could not be compensated. The court there said (p. 181):

" 'If the disability, although arising from a chronic heart trouble, was brought on by any strain or excitement incident to the employment, the industrial liability still exists. Acceleration or aggravation of a preexisting disease is an injury in the occupation causing such acceleration.' . . . 'It is the hazard of the employment acting upon the particular employee in his condition of health, and not what that hazard would be if acting on a healthy employee.' "

We are convinced that the evidence before the Board established a clear case of causal connection between the inhalation by deceased of sulphur fumes at the fire referred to and his death following. The conjectural and speculative evidence of Dr. Galante and the unsworn statement of Dr. Sullivan, as against the definite testimony of the other medical witnesses, cannot, in our judgment, be regarded as evidence reasonably tending to support the decision of the Board. *Prendergast v. Retirement Board,* 325 Ill. App. 638, 647. On the contrary, we are compelled to say that there is no evidence in the record which reasonably tends to support the Board's determination.

The judgment of the superior court is correct, and accordingly it is affirmed.

*Affirmed.*

NIEMEYER, P. J. and TUOHY, J., concur.