SAMUEL LÓPEZ MALDONADO ETC., Plaintiff and Respondent, v. HON. LUIS MUÑOZ MARÍN, ETC. ET AL., Defendants and Petitioners.

No. 80    Submitted April 3, 1959.—Decided May 18, 1959.

Hiram R. Cancio, Secretary of Justice (*Francisco Espinosa*, *Acting Secretary of Justice* in the petition and memorandum), *Arturo Estrella, Assistant Secretary of Justice* and *Jorge Tomás Nido de Goenaga, Assistant Attorney General*, for petitioners. *Rodolfo F. Aponte* for respondent.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The plaintiff Samuel López Maldonado was physically disabled while rendering service to the Police of Puerto Rico. He requested the pension for disability for work provided in Act No. 189 of May 2, 1951 (Sess. Laws, p. 476), which was denied to him by the Police Superintendent. He then resorted to the Superior Court claiming payment thereof. According to the facts, accepted by the parties, on May 21, 1954 at 9:30 p.m., López Maldonado *tried to arrest* a certain Efraín Quintana Feliciano, who was charged by some persons with having threatened them with a pistol shortly before. When the plaintiff appeared at the place of events Feliciano took flight, pistol in hand, and upon pursuing him, the plaintiff fell receiving contusions on the knee and on the head which totally and permanently disabled him from serving in the Police of Puerto Rico, being separated therefrom on October 5, 1955. Relying on these facts over which there was no controversy, the Superior Court entered judgment on the pleadings ordering that plaintiff be paid the pension determined by Act No. 189 of May 2, 1951, as of the date when he was separated from service.

In the petition for review the defendants-petitioners allege that the Superior Court, (Tilén, Judge) erred in concluding that according to these facts the injury which caused the plaintiff's disability entitles him to receive the pension provided for in said Act No. 189. They alleged further, that in the case of *José R. Rentas* v. *Hon. Luis Muñoz Marín et al.*, No. 57–5800, there was actually a similar situation in which

the San Juan Part of the Superior Court (Calderón, Judge), held that the provisions of Act No. 189 were not applicable to this type of accident. This Court having already consented to review that decision, we issued the writ in the present proceeding to decide the conflict of opinions which arose in the Superior Court and to establish the rule as regard the application of Act No. 189 to disabilities for service in situations such as those which occurred in these cases.[1]

The petitioners maintain that it was not the legislative intent to include in this Act No. 189 all the hazards that could be met in the course of their work by policemen and other servants of the public security embraced by such Act, but the extraordinary hazards particularly inherent in their duties and employments; that in the case of a policeman, Act No. 189 covers only "those damages caused as a *direct, violent, and extraordinary* result of the act of arresting a delinquent or attempting to prevent the commission of an offense"; and that in this case it was a mere labor accident having no connection with the circumstances provided by Act No. 189, and therefore, it is governed by the provisions of Act No. 447 of May 15, 1951 (Sess. Laws, p. 1298). Let us look into the matter:

◼ In the Regular Session of 1951 the Legislature considered and enacted a general retirement system for public employees, including the Police of Puerto Rico, under the provisions of Act No. 447 of May 15 of that year—3 L.P.R.A. § 761. In § § 9 and 12 of this Act—3 L.P.R.A. § § 769, 772 —as originally enacted,[2] a member of the Police Force be-

---

[1] In both cases the injury occurred in practically identical circumstances. Policeman José R. Rentas caught several individuals playing dice. In trying to arrest them they took flight and while pursuing them Rentas fell down suffering an injury on the right knee which left him totally disabled for police service.

[2] Amended by Acts Nos. 73 of 1954 (Sess. Laws, p. 374), 40 of 1955 (Sess. Laws, p. 136), and 39 of 1957 (Sess. Laws, p. 92).

came entitled to receive a pension equal to 50% of his salary, or up to 60% to his widow and children in case of death, if as the result of a physical disability *arising out of and in the course of employment,* he became disabled for duty or died, provided that the disability was compensable under the Workmen's Accident Compensation Act; and subject also, to other restrictions and limitations. In the same Session the Legislature considered and enacted Act No. 189 of May 2, 1951— 25 L.P.R.A. § 361—granting an annual pension equivalent to the total salary of any member of the Insular Police Force, the National Guard, the Fire Service Force, and the Penal Guard, who became disabled to continue in the service and to the beneficiaries thereof in case of death, when such disability or death occurred under the circumstances stated in § 1 of said Act. Preceded by a declaration of policy stating the purpose of Act No. 189: ". . . of alleviating the needy and indigent situation which the disability for physical work or the death of members of the Insular Police, the National Guard, the Insular Fire Service Force and the Penal Guard leave among themselves or their families when such disability or death occurs *while these servants of the public security devote themselves to the defense of the respect due to general freedom and to the peace in which The People of Puerto Rico desires to develop its institutions";* and also that "[T] he Legislature understands that every servant of the public security, be it a policeman, national guardsman, fireman or penal guard, should be insured by law a like treatment for his folk if he loses his life *in protecting the life of others* while honorably performing his duties," (emphasis supplied) § 1 provided that the provisions of said Act No. 189 would be applicable in cases of disability for physical work or of death *"occurring under the following circumstances:*

"(a) In case of a member of the Insular Police, when preventing or attempting to prevent the commission of an offense, or when arresting or trying to arrest a person who

can be reasonably presumed to be connected with the commission of an offense." [3]

The point at issue is which of the two statutes should apply for the purpose of determining the pension that corresponds to the respondent, whether Act No. 447, as alleged by the petitioners, or Act No. 189 of 1951. Ordinarily, a policeman or other servant of the public security is exposed to greater risks and dangers against his person than any other servants of the government, but not every task undertaken by a policeman exposes him to the same degree and extent of risk and danger, nor requires him to exert the same zeal and courage. We agree with the petitioners in that it was not the legislative intent to embrace in Act No. 189 the disability and death that might result out of all the accidents and damages that could occur to a policeman or other servant of the public security while performing his duty. That such was not its intention arises from the very text of the Act, and clearly from the fact that while adopting this special legislation of pensions for servants of the public security only, the Legislature at the same time included the policemen and firemen within the general retirement system in case of physical disability or death within the course of the employment provided by Act No. 447, equally applicable to any other public employee. Hence, with the occurrence a few months previously of bloodshed and violence still fresh in

[3] The same provision was made in the case of a member of the National Guard. As to a member of the Fire Service Force "when engaged in extinguishing a fire *or when going to any place* to fight a fire." Other sections of the Act provided, among other things, that such pensions would be exempt from attachment or execution and from the payment of income tax; they would be made in addition to any compensation granted by the State Insurance Fund, which did not occur with the pension under Act No. 447; they would be paid from general funds from the Treasury for which they would be appropriated in the General Budget for each year; and that in order to enforce the Act the Department of Justice would prosecute the necessary judicial proceedings free from fees and the other offices and judicial centers would render their services free from fees.

their mind, the Legislature itself upon enacting Act No. 189 jointly with No. 447, made the proper evaluation and separation of those occupational activities of a member of the public security, in contradistinction of others, which would entitle him, in case of disability or death, to the highest special pension and in the most beneficial terms granted by the former. Experience tells us that the Legislature might have had in mind not only the highest degree of exposition to danger but also the highest degree of sacrifice, abnegation, and detachment on his part and his family's, which the community requires for its protection and defense. In making that evaluation and separation of functions, the Legislature concluded as a matter of fact that when a policeman is disabled for work or dies *when arresting or trying to arrest* a person who commits an offense or who can be reasonably presumed to be connected with the commission of an offense, such policeman was, as stated in the declaration of policy, devoted to the defense of the respect due to general freedom and was protecting the life of others which, therefore, entitled him to the pension provided in that Act.

██ In reality the petitioners do not question that the respondent was disabled when attempting to arrest a delinquent. But, invoking what according to them was the legislative intent, they maintain that in order to apply the provisions of Act No. 189 it is necessary that the disability be produced as a result of some direct, violent, and extraordinary damage from the act of arresting. Their argument is that here it concerns a natural accident that could have happened to any person running "to catch a bus"; that there was no "extraneous" force or violence and even less on the part of the person that the plaintiff was trying to arrest; and that a contrary conclusion would lead to extreme results because a policeman who "slipped" in the bath at headquarters "when being called to stifle an uprising" could claim this pension.

334

Petitioners are not right.  No such extreme, or if you wish, absurd results are reached, if we take the words used in the Act in their own meaning.  *"Apresar"* according to the *Diccionario de la Lengua Española de la Real Academia Española,* means to seize, to capture with clutches, or claws, to apprehend.  *"Aprisionar"* means to bind, fasten.  *"Tratar de"* means "to procure the attainment of some end."  It can be seen that the Act contemplated the effective act of seizing, grasping or taking hold of a person to apprehend him, and the effective act of procuring such end or attainment; there being no reason for the extreme situations invoked by the petitioners and which are easily distinguishable at plain sight.[4]

Of course, in the act of arresting or trying to arrest a person there can be violence or the need of a tenacious pursuit regardless of the hazards thereof, or perhaps no violence whatever, depending on the circumstances and how the events, unpredictable in each case, develop.  A pursuit under such circumstances constitutes a risky and violent act in itself.  But in any event, the lawmaker did not wish to go beyond the text of the Act in separating the functions, nor impose other circumstances and requirements for the enjoyment of this pension than those determined in a specific manner. Once the policeman or other servant of the public security is in the discharge of the duty included in the specified circumstance, the Act does not indicate that it mattered to the Legislature how the injury causing the disability was in-

---

[4] In the case of *Francisco Rentas Salgado* v. *Commonwealth of Puerto Rico et al.,* No. 11,903, decided on December 7, 1956, we affirmed without opinion the judgment entered by the Superior Court denying to said plaintiff the pension of this Act.  According to the facts, Rentas Salgado became disabled by injuries suffered when falling from his motorcycle while going to a place a little over a kilometer away where, by information that he received from a road laborer, two workmen were breaking the highway without any permission whatever.  We concluded with the Superior Court that at that moment the policeman was going to investigate a case and was not preventing or attempting to prevent the commission of an offense or arresting or trying to arrest a person.

flicted. It was not so much the type of damage in each particular case, as the very nature of this kind of service, coupled with the purpose of protecting and defending others, what might have proved the underlying purpose of the legislative action, although the damage arose as it did in this case without the intervention of an external act of violence. It should be noted that the Act, which should be taken in its context as a whole, was made applicable to a fireman who is disabled or dies not only in the hazardous task of extinguishing a fire, but also *when going to any place* to fight a fire, the damage possibly arising at that moment as a result of an ordinary traffic accident. The difference from other duties lies in the fact that in such acts there exists a compulsory and unavoidable element that impels the agent to face danger, regardless of how it appears or the consequences for the person, irrespective of the agent's will.

However, the petitioners invoke the "legislative intent" to support their interpretation that "insofar as policemen are concerned, the risks covered by the Act are those damages caused as a direct, violent, and extraordinary result of the act of arresting a delinquent or attempting to prevent the commission of an offense." They infer that that was the purpose of the lawmaker. They adduce two arguments: (1) that in the case of firemen specifically the ordinary risk of an automobile accident when going to any place to fight a fire was covered, and (2) that the Act was enacted right after the nationalist revolt in which the policemen had to face extraordinary risks. It is curious that both arguments forcibly strengthen our interpretation of the Act.

The implied premise of the first argument is the legal aphorism that if the Act refers to a given case, all the rest are considered excluded (*inclusio unius est exclusio alterius*). But this maxim of restrictive interpretation is inapplicable for the simple reason that the meaning of the Act does not admit exceptions in the case of policemen. In effect, in gen-

eral and conclusive terms the lawmaker covered *all* the cases in which the disability or death of a policeman occurs when arresting or trying to arrest an alleged delinquent. And above all it should be stressed that the purpose of the Act was "alleviating the needy and indigent situation . . . when [the] disability or death occurs while these servants of the public security devote themselves to the defense of the respect due to general freedom and to the peace in which The People of Puerto Rico desires to develop its institutions." Hence, obviously the provision concerning firemen is not of an exceptional nature. If we consider the reasons that the lawmaker had to cover the risk run by firemen when going to any place to fight a fire, it is necessary to conclude that neither did he wish to exclude the risk run by policemen of falling or becoming disabled when pursuing and trying to arrest any delinquent. Where the same reason exists, there the same law prevails.

The fact that Act No. 189 of 1951 was enacted right after the nationalist revolt, does not warrant a restrictive interpretation based on the "legislative intent." On the contrary, this circumstance indicates rationally that the lawmaker intended to cover all the cases and consequences of danger faced by policemen when arresting or trying to arrest delinquents. The purpose of the Act was undoubtedly to grant a sweeping protection to these officers. It was so required by the social interests and needs at that moment. Therefore, if the lawmaker would have wanted to admit exceptions, he would have made the pertinent exceptions instead of expressing himself in general terms. The only plausible conclusion is that the motives and purposes pursued by the Act of 1951, according to the view or concept accepted by the lawmaker, preclude any distinction between "common risks" and "extraordinary risks," when disability or death arises "in preventing or attempting to prevent the commission of an offense, or when arresting or trying to arrest a

person who can be reasonably presumed to be connected with the commission of an offense."

As we have seen, our interpretation of the statute reconciles the literal meaning of the text with the motives and purposes of the Act. Actually the petitioners ask us to disregard both elements of the interpretative process in this case. They also forget that when the lawmaker has expressed himself in clear and unambiguous language the text of the Act is the perfect expression of the legislative intent. Civil Code (1930 ed.), § 14, 31 L.P.R.A. § 14; 2 Sutherland Statutory Construction (3d ed.), § 4701 *et seq.;* Endlich, Interpretation Statute, ch. I, § 1 *et seq.;* Sutherland, Statutes and Statutory Construction, ch. XIII, § 234 *et seq.;* Black, Construction and Interpretation of the Laws, ch. 3 at 51.[5] In *Atiles, Mgr. State Ins. Fund* v. *Industrial Comm'n,* 77 P.R.R. 15, 19, we stated that it is the duty of the court to adhere to the letter of the law, although a literal interpretation should not be adopted when it is contrary to the general authentic intent and the true purpose of the Legislature and would obviously lead to absurd and unreasonable results; and even so, we said that if such were the legislative intent and the text of the law leaves no room for assuming a different purpose on the part of the lawmaker which might be more rational and fair, the courts must not impose their own criterion of justice and reasonability, and must respect the legislative will. And in *Clínica Juliá* v. *Sec. of the Treasury,* 76 P.R.R. 476, 486:

"But those are cases which deal with internal contradictions in the statute itself, where it is the duty of the courts to resolve those contradictions with a view to determining the legislature's genuine intent. That purpose belongs not to the judge but to the legislature, as it may arise from the statute itself. The

---

[5] *Irizarry* v. *Registrar,* 61 P.R.R. 70, 73; *Sobrino de Izquierdo, Inc.* v. *Treas.,* 55 P.R.R. 127, 132; *Durand* v. *Treasurer,* 50 P.R.R. 897, 900; *De la Rosa* v. *Winship,* 47 P.R.R. 312, 313; *Martínez* v. *Insular Board of Elections,* 43 P.R.R. 395, 403; *Roig* v. *Bustelo et al.,* 40 P.R.R. 580, 585; *Aponte, Jr.* v. *Atlas Commercial Co. et al.,* 27 P.R.R. 228, 230.

judge is an interpreter and not a creator. His power of construction acquires relevance when several probable meanings arise from the statute which furnish an adequate margin for judicial selection, but if the language is so unequivocal as to suggest only one meaning, a full sense of judicial humility and self-discipline requires the application of the legislative will. Frankfurter, 'Some Reflections on the Reading of Statutes,' 47 Col. L. Rev. 527; 1 Mertens 59. That is a rule of judicial honor. . . ."

See: *De la Haba* v. *Tax Court; Treas., Int.*, 76 P.R.R. 865, 887. Where the language of a [tax] statute is clear, it must be applied as the Legislature wrote it, not as this Court or the Secretary [of the Treasury] might wish to read it; *Community of the Heirs of Fajardo* v. *Tax Court*, 73 P.R.R. 499, 505. In this case we said upon reversing the Superior Court which denied the right to deduct certain interests for the purposes of income tax, that the courts have no authority to write into the unambiguous language of a statute what the Legislature, whether deliberately or not, chose to omit, even recognizing that the application of the Act as it was made by the lower court obeyed a general legislative policy against the deduction of such interests in certain specified cases.

There is no reason for us to interpolate in the statute, what might constitute an impingement on the legislative function, the additional fact that disability must arise as a direct result of damage directly inflicted by the person who is arrested or was sought to be arrested, assaulting the policeman or by any other means of external violence. As we set forth in *Caguas Bus Line, Inc.* v. *Comm'r of Labor*, 73 P.R.R. 690, 697, the Legislature in this case was fully aware of the problem, especially when in the same Session it enacted both pension statutes, foresaw the economic impact of this special pension providing for its payment from the Public Treasury without being subject to the solvency of a particular fund, and there is no reason for imposing restrictions that are

not in the Act, more so when it is a generally applied rule that pension laws must be liberally interpreted in favor of the beneficiary in view of the remedial purpose for which they are enacted. Black, Construction and Interpretation of the Laws 506, ch. 12; 3 Sutherland Statutory Construction (3d ed.), § 7209; *Garratt* v. *City of Philadelphia*, 127 A.2d 738 (Pa. 1956); *Sabathier* v. *Board of Trustees, Firemen's Pension and Relief Fund for the City of New Orleans*, 72 So.2d 1 (La. 1954); *Gilman* v. *City of Long Beach*, 245 P.2d 512 (Cal. 1952); *O'Brien* v. *Retirement Board, etc.*, 99 N.E.2d 681 (Ill. 1951); *Vernon et al.* v. *Firemen's Pension Fund of Philadelphia*, 52 A.2d 199 (Pa. 1947); *Prendergast* v. *Retirement Board, etc.*, 60 N.E.2d 768 (Ill. 1945); *Meyer* v. *Board of Trustees of F. Pension & R. Fund*, 6 So.2d 713 (La. 1942); *Bradley* v. *City of Los Angeles et al.*, 131 P.2d 391 (Cal. 1942); *Dillard* v. *City of Los Angeles*, 127 P.2d 917 (Cal. 1942); *Naughton* v. *Retirement Board of San Francisco*, 110 P.2d 714 (Cal. 1941); *Peters* v. *Sacramento City Employees' R. System*, 80 P.2d 179 (Cal. 1938); *Casserly* v. *City of Oakland et al.*, 12 P.2d 425 (Cal. 1932); *Buckley* v. *Roche et al.*, 4 P.2d 929 (Cal. 1931); *People ex rel. Donovan* v. *Retirement Board Policemen's Annuity and Benefit Fund et al.*, 158 N.E. 220 (Ill. 1927); *Elliot* v. *City of Omaha*, 191 N. W. 653 (Neb. 1922); *State* v. *Board of Trustees of Policemen's Pension Fund*, 119 N.W. 806 (Wis. 1909).[6]

▉ The petitioners' last argument is that when Act No. 127 of June 27, 1958 (Sess. Laws, p. 300), which substituted Act No. 189 of 1951 was enacted, the requirement of assault upon the policeman was provided for these cases which proves, coupled with the repeal of Act No. 189, that such has always

---

[6] In the above-cited cases the courts granted pensions to policemen and firemen under special statutes similar to ours, rejecting, in some of them, the argument that is adduced here of the necessity of an external act of violence, even in situations in which it was required that the person die or be killed in the performance of the specific function and it was proved that the death was natural or by aggravation of an existing illness.

been the legislative intent. Act No. 127 does not have the scope which is attributed thereto. In the first place, 5 years after the Act of 1951 went into effect and the lawmaker knew its effects, it was amended by Act No. 94 of June 23, 1956 (Sess. Laws, p. 612) so as to include internal revenue agents in circumstances more favorable than those related to policemen and which did not necessarily imply facing a personal assault or violent harm. In the second place, Act No. 127 of 1958 did not have as its sole purpose the addition of the requirement of assault on the person, nor in general terms was it intended to restrict the beneficial scope of the former statute, but on the contrary, it enlarged the same considerably. According to the Report of the Committee on Elections, and Personnel of both Houses,[7] the purpose was to make a total revision of the legislation in force with a view to certain explanations and to supply omissions of functional and administrative character which became necessary. If on the one hand the requirement of physical assault was added, on the other hand the circumstances under which a policeman is entitled to a pension were enlarged, including now the action of going to the place of a fire and rendering services in the fighting thereof; participating in saving the life of a fellow-being at the expense of his own life, and in the protection of properties which may be in danger (see § 2 of Act No. 127), situations which according to the said report do not require physical assault upon the officer. In the statement of motives of this last Act it is expressed that it is "in recognition of the *risk* involved in the performance of the duties of these public servants and as a fair recompense for the zeal, courage, loyalty, and firmness displayed by them in facing that risk." It can be seen that it does not involve a merely explanatory statute with retroactive effects.[8]

---

[7] Journal of Proceedings, vol. X No. 74 (Senate), p. 1264; No. 92 (House), p. 1973.

[8] When an amendment was proposed to make the provisions of Act No. 127 retroactive to 1951 as perceived from the discussion, with a view

Everything indicates that it implements prospectively a public policy in the light of the prevailing circumstances in 1958, different from those that could have existed in 1951, right after a period of unrest and general violence. On both occasions the clear and unambiguous language of the statute equally expresses the purposes of the Act. The judgment object of this petition for review will be affirmed.

---

to favor the beneficiaries, as in the case of penal guards, the leader of the majority, Hon. Arcilio Alvarado, rejected every intent of retroactivity stating that the amendment "could have the effect of *depriving* a person of his right of action when he actually had one, under the present language of the Act"; and that a retroactive amendment, "perhaps to give cause of action to persons who believed not to have it, or perhaps to deprive a person of his right of action when he actually had such right," seemed to him to be risky. The amendment was withdrawn. Journal of Proceedings, vol. X No. 92, p. 1989.